UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

BETTY J. OVERBY,

                    Plaintiff,

v.                                                      4:08CV39

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.


MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

        Plaintiff brought this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Secretary of Health and Human Services denying her receipt of disability insurance benefits (DIB) under the Social Security Act.  Plaintiff and defendant have both filed motions for summary judgment.  The motions were referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference entered August 15, 2008.

I. STATEMENT OF THE CASE

A.  Procedural Background

        On August 13, 2003, plaintiff filed an application for DIB, alleging that she became disabled on January 9, 2003, due to interstitial cystitis, low back pain, depression, and anxiety.  (R. at 67, 79, 90.)  Plaintiff's claims were denied initially and on reconsideration. (R. at 47, 53).  A request for hearing was timely filed and was granted.  The hearing was conducted on February 22, 2006.  Plaintiff was represented by counsel and testified in the course of the hearing, as did a vocational expert (VE).  (R. at 533-63.)  On March 21, 2006 an

administrative law judge (ALJ) denied plaintiff's claim for DIB.  (R. at 15-22.)  On April 14, 2006, plaintiff filed a request for review of the ALJ's decision.  (R. at 13.)  On February 1, 2008, the Appeals Council denied plaintiff's request, thereby making the decision of the ALJ the final decision of the Commissioner.  (R. at 7.)

On April 4, 2008, plaintiff filed a complaint in federal court, appealing the Commissioner's final decision, and on July 25, 2008, defendant filed an answer.  On September 30, 2008, plaintiff filed a motion for summary judgment, alleging that the Commissioner's final decision that plaintiff is not disabled within the meaning of the Act is not supported by substantial evidence.  On October 30, 2008, defendant filed a motion for summary judgment.  This matter is now ripe for consideration.

## B.  Factual Background

Plaintiff was born on November 25, 1956, and was forty-nine years old at the time of the hearing.  She received her GED and attended two years of college.  (R. at 87.)  Plaintiff is married and lives with her husband.  (R. at 78, 100.)  From 1989 through 1990, plaintiff worked as a sales associate at a department store.  From 1992 through 1995, she worked as a typist/secretary for a research center, and from 1996 through 1997, she worked for a temp service. (R. at 80, 103.)  Plaintiff was next employed at Harris Publishing as a data entry clerk until 1998, when she started working at the Hampton Police Department (HPD) as a data entry technician, where she remained until January, 2003. (Id.)

### 1.  Medical history

#### a.  Treating physicians

In October, 2000, plaintiff was seen by Dr. T.T. Nguyen for consultation and management of chronic pelvic pain.  (R. at 164.)

2

Plaintiff reported having a hysterectomy in March, 2000, which provided little relief.  Nguyen noted that the pain was of unknown etiology, but he suspected that it was more neuropathic.  He increased plaintiff's dosage of Neurontin and prescribed Vioxx, in addition to her current medications of Elavil, Vicodin, Ambien, Pyridium, and Ditropan.  (R. at 165.)  On January 9, 2001, plaintiff returned for a follow-up, reporting that her symptoms were slowly improving, but she continued to have pain with a full bladder.  (R. at 163.)  She reported no new symptoms, and Nguyen's impression was that her condition was consistent with interstitial cystitis.[1]  (<u>Id.</u>)

On September 12, 2002, plaintiff saw Dr. Kendall C. Jones, complaining of constipation and a possible obstruction in the sigmoid colon.  (R. at 170-72.)  Jones noted that a colonoscopy performed in February, 2002, was normal except for some small internal hemorrhoids. His impression was that plaintiff had a mildly weak anal contraction. He ordered a barium enema, which revealed no masses, lesions, strictures, or diverticula.  (R. at 169).  Jones referred plaintiff to a specialist in Richmond for chronic constipation and pelvic pain.  (<u>Id.</u>)

On November 5, 2002, plaintiff saw Dr. Lynn Dahl, complaining of "intense burning" pain in her tail bone region. (R. at 230-31). Dahl's diagnosis was coccydnia, and on December 6, 2002, she administered a coccygeal ligament injection.  (R. at 175.)  Plaintiff returned to Dahl on January 15, February 5, March 3, and July 7, 2003, reporting continued pain in her lower back and tail bone.  (R. at 226-29.)  Dahl

---

[1]  Interstitial cystitis is a certain urinary bladder inflammation occurring predominantly in women, which typically causes urinary frequency and pain on bladder filling and at the end of urination.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 470 (30th ed. 2007).

treated the pain with various medications, recommended vocational rehabilitation, and continued chiropractic treatments. (Id.)

On April 29, 2003, plaintiff had a right presacral mass removed from her back, which was found to be a benign lipoma mass (fatty tissue). (R. at 181-82.) However, removal of the mass did not alleviate plaintiff's symptoms of sacral and lower back pain. (R. at 189.)

On February 12, 2003, plaintiff saw Dr. Reeta M. Arora, at the Spine Center of Hampton Roads, complaining of lower back and right buttock pain. (R. at 195-97.) Plaintiff described the pain as burning and worse with sitting, standing, walking, lying on her back, and driving. Plaintiff stated the pain improved with ice packs, heat, physical therapy, and chiropractic treatments. (R. at 196.) An examination revealed that plaintiff was in no acute distress, her gait was normal, and the strength in her extremities was 5/5 in all muscles, with the exception of her left quadriceps which had 4/5. An MRI performed in May, 2001, revealed a Tarlov cyst on the right S1 nerve root, as well as a small disk bulge at L1/L2 and central disk protrusion at L2/L3. Arora recommended a repeat MRI and advised strengthening of plaintiff's quadriceps. (R. at 197.) Arora described plaintiff as pleasant and noted that she denied any anxiety or depression. (R. at 196.)

An MRI performed February 17, 2003, revealed that the Tarlov cyst was slightly larger than the previous scan and revealed the presence of a possible second cyst on the left side near the left S2 nerve root. (R. at 193-94.) Arora discussed the MRI with plaintiff and noted that she was going to discuss surgical options with "Dr. Kerner." (R. at 192.) Arora advised plaintiff to remain active and to continue taking Ultram and prescribed Darvocet for breakthrough pain. (Id.)

4

On April 24, 2003, plaintiff saw Arora, reporting that her lower back and right buttock pain remained unchanged. (R. at 191.) Plaintiff told Arora that she had seen a local neurosurgeon who did not recommend removal of the cyst. Arora administered a trigger point injection, which eased some of the muscle tightness, but plaintiff continued to have an area of tenderness to palpation in the right buttock. (R. at 189.) Arora advised plaintiff that she should not hold a job which required her to stand more than twenty percent of each hour. On August 8, 2003, Arora administered another trigger point injection and advised plaintiff to continue with a stretching program and massage therapy. (Id.)

On March 3, 2003, plaintiff was seen by Dr. Wallace K. Garner at the Hampton Roads Neurosurgery and Spine Center. Garner noted that plaintiff's pain was sacrococcygeal and on the right side, but she did not complain of lower back pain. (R. at 237-38.) Plaintiff reported that in 1991, she had struck her sacrococcygeal area on a hard object, and the pain in her sacral region had persisted and worsened since. Garner noted that another MRI revealed a Tarlov cyst of the same size as the scan in 2001. A physical examination revealed a normal gait, low back range of motion without pain, and no evidence of hip problems. Garner's impression was that plaintiff's sacral pain was possibly related to her old injury. He recommended a bone scan and a more aggressive pain management approach. At that time, plaintiff was taking Ultram, Zanaflex, Elavil, and Ambien. (Id.)

On September 29, 2003, plaintiff saw Garner, reporting that the pain in her right sacral region had gradually increased in severity, and pain management had not provided relief. (R. at 234.) In reviewing an MRI performed September 26, 2003, Garner determined that the mass was

5

probably not a Tarlov cyst, but possibly a schwannoma [2] and recommended that it be removed. (Id.)

On May 29, 2001, plaintiff saw Dr. Richard B. McAdam, complaining of left leg pain and weakness, back pain, sciatic pain, and right leg pain. (R. at 247.) McAdam noted that plaintiff had been diagnosed with femoral neuropathy in her left leg after her hysterectomy in 2000. He further noted that the chronic interstitial cystitis was well-documented. A physical examination revealed that plaintiff's gait was normal, her station was stable, and her muscle strength was 5/5 in all muscles, except slightly weak in the left quadriceps. (R. at 249.) She could squat, rise, and walk on her heels and toes, and she could squat and rise without assistance, but straight leg raising caused plaintiff bilateral back pain. Neurologically, plaintiff was oriented to time, place, and person with good recent and remote memory, as well as normal attention span and concentration. (R. at 248.) McAdam did not have any specific treatment recommendation other than physical therapy, noting he was "at a dead end." (R. at 250.)

Plaintiff returned to McAdam on October 3, 2003, after Dr. Garner suggested that the cyst revealed on the MRI of 2001, was not a Tarlov cyst, as originally thought. (R. at 243-45.) A physical examination revealed a normal gait and stable station, 5/5 muscle strength in all muscles, and normal muscle tone in all limbs. McAdam noted that plaintiff was pleasant with normal mental status, and she was oriented to time, place, and person; her recent and remote memory was good; her attention and concentration span was normal; and she had decreased range of motion in forward flexion of the back. After

---

[2] A schwannoma is a neoplasm, or abnormal growth, originating from Schwann cells (of the myelin sheath) of neurons. Dorland's at 1703.

reviewing the most recent MRI, McAdam concluded that the cyst was possibly a neurofibroma.  He advised plaintiff of the surgical risks and advised her to go home and think about it.  (R. at 246.)

After opting to have the surgery, the mass was removed on October 29, 2003, and was found to be a schwannoma.   On November 18, 2003, McAdam noted that plaintiff's status was "excellent."  (R. at 241.) On December 16, 2003, plaintiff returned to McAdam, reporting some back pain and leg discomfort.  (R. at 240.)  However, McAdam again noted that plaintiff was in "excellent status with good ongoing recovery," and discussed the need for plaintiff to come off the narcotics she was taking, as he felt she was physiologically addicted to them to some degree.  On January 23, 2004, plaintiff saw McAdam for the final time, reporting upper lumbar paraspinal discomfort and vague numbness in her right leg.  (R. at 239.)  Plaintiff's neurologic examination was normal, except for depressed ankle reflex on the right, and McAdam noted that "[i]nterestingly," plaintiff was "able to squat and rise to walk on heels and toes."  McAdam stated that he was going to refer plaintiff to "Dr. Ross" and noted that she was "progressively becoming housebound, not doing any activities to speak of."  (Id.)

On January 5, 2004, plaintiff completed a daily activities questionnaire, claiming that her daily activities were limited to bed rest and light walking. (R. at 96.)  She reported that she did no household chores due to depression and pain, which prevented her from bending or lifting.  (R. at 97.)  She reported that she had no hobbies, and she could not concentrate for more than ten to fifteen minutes.  (R. at 98, 99.)  She claimed that anxiety and depression prevented her from engaging in social activities, and she admitted that she had not seen a

psychiatrist or counselor for  depression and anxiety because she could not drive.  (R. at 100, 101.)

On February 10, 2004, plaintiff saw Dr. Mark A. Ross, who noted that the examination was "without major physical finding."  (R. at 275-78.)  Plaintiff reported that she had anxiety and depression but had not sought psychological or psychiatric help.  Ross noted some tightness of the hip flexor and some weakness of the hip extensor, but he assessed this to be a result of inactivity over the prior year.  In Ross's opinion, plaintiff could "make a significant recovery and return to her premorbid level of functioning including gainful employment."   Ross recommended physical therapy.  (Id.)

On April 13, 2004, plaintiff saw Ross complaining of burning pain in the right lower back and buttock.  She reported that physical therapy was helpful and that she could see some improvement.  (R. at 273.)  Plaintiff's physical examination revealed good strength in the muscle groups of her lower extremities, minimal tightness anteriorly on the right, and minimal tenderness to palpation of the right lower back. (R. at 274.)  Ross specifically noted that plaintiff was upset about being denied disability because she felt she was incapable of gainful employment.  (R. at 273.)  Because she was so determined to obtain disability status, Ross felt a productive outcome of plaintiff's physical therapy was less probable.  Ross told plaintiff that in his opinion, she was not an appropriate candidate for disability status.  (R. at 274.) He concluded by noting that he had no medical basis for specifically limiting plaintiff's functional activities.  (Id.)

On May 12, 2005, plaintiff saw Ross, reporting that since stopping physical therapy in March, 2005, the pain had returned with great severity and that she could not work or perform household tasks.

8

(R. at 448.)   Ross noted that plaintiff was appropriately dressed and groomed, her gait was normal, and she showed good strength in the muscle groups of both lower extremities.   Ross further noted that most of the visit was spent on counseling.   (R. at 449.)   He stated that he had no explanation for plaintiff's persistent symptoms, and it was his opinion that there was a "psychological/behavior component present."   (Id.)

On July 26, 2004, plaintiff was seen by Rhonda T. Sproles, a licensed clinical social worker at the Hampton Roads Counseling Center. In a mental status evaluation form, Sproles noted that plaintiff's symptoms were likely related to the onset of her medical condition and exacerbated by the lack of support from her husband. (R. at 291.) Sproles further noted that plaintiff performed typical household duties, which was at times limited by her level of pain.   (R. at 292.)   An examination revealed that plaintiff was well groomed; she had good orientation; and she had no suicidal ideations, delusions, or hallucinations.   (R. at 293.)   Plaintiff had a flat, guarded affect, but she had appropriate thought content and organization, attention span and concentration, and no confusion.   (R. at 293-94.)   Sproles noted that plaintiff likely had limitations in performing calculations, and her judgment could have been impaired due to her pain and depression.   (R. at 294.)   Sproles diagnosis was dysthymic disorder.   (R. at 291.)

On September 9, 2003, plaintiff was seen by Dr. Tushar Gajjar, a pain management specialist.   (R. at 357.)   During the initial consultation, plaintiff complained of low back pain and right posterior thigh pain.   She stated that she could stand for only ten to fifteen minutes, and she rated her pain level at eight on a scale of ten.   She reported taking various medications, but none had provided much relief. (R. at 358.)   Plaintiff denied any psychological problems.   A physical

examination revealed that her gait was normal, she was able to raise on her heels and toes without difficulty, and motor strength was 5/5 in her lower extremities.  (R. at 359.)  Plaintiff exhibited mild sacroiliac joint tenderness and mild tenderness to palpation over the right paraspinous musculature.  Gajjar recommended epidural steroid injections. (R. at 360.)

On October 21, 2003, plaintiff saw Gajjar, reporting that she was very anxious about the new diagnosis concerning the Tarlov cyst being an actual tumor.  (R. at 355.)  Gajjar prescribed Ativan for anxiety and informed plaintiff that the goals of her treatment would be acute pain control and symptom management.  On February 3 and February 24, 2004, Gajjar administered S1 selective nerve root blocks, and immediately after each injection, plaintiff's pain decreased from 6/10 to 0/10 on the VAS pain scale.  (R. at 344, 348.)  Gajjar administered trigger point injections on several occasions, and plaintiff reported improvement and a reduction in pain to zero following the injections.  (R. at 331, 333-37.)  Following an injection in January, 2005, plaintiff was able to sit with significantly less discomfort and indicated that she was "happy with the results."  (R. 333-34.)

On April 5, 2005, plaintiff saw Gajjar, complaining of pain in her right buttock, which she rated an eight out of ten.  (R. at 461.) Gajjar administered an injection in plaintiff's right sacroiliac joint, which immediately reduced her pain to zero out of ten.  When plaintiff saw Gajjar on May 24, 2005, she reported that she was fifty percent improved.  A physical examination revealed no paraspinous muscle tenderness, no tenderness to palpation over the sacroiliac joints, and the range of motion maneuvers of the lumbar spine did not result in

increased pain.  (R. at 459.)  Plaintiff reported that chiropractic care was providing some benefit.  (Id.)

On August 18, 2005, plaintiff saw Gajjar, reporting localized pain over the right gluteal region, which she rated 10/10 on the VAS scale. (R. at 457.)  An examination revealed normal alignment, tenderness to palpation in the area of the sacrococcygeal ligament, tenderness to palpation over the sacroiliac joint, no increased pain with range of motion of the lumbar spine, and equal and symmetrical motor strength in the lower extremities.  Gajjar administered a trigger point injection, which reduced the pain to 0/10.  (R. at 458.)  Gajjar recommended that if the symptoms returned, plaintiff could continue with maintenance injections.  (Id.)

On September 20, 2002, plaintiff saw Dr. Natalie Barron for low back and coccyx pain.  (R. at 394.)  Plaintiff denied any weakness in her right leg, and she denied depression, although she appeared to be tearful during the visit, and she reported being tearful and anxious much of the time due to pain.  Barron prescribed Elavil for pain, referred her to neurosurgery for possible injections, and gave her a three-week excuse from work.  (Id.)

On January 3, 2003, plaintiff saw Barron, reporting right foot and back pain.  (R. at 380.)  Plaintiff stated that she had been anxious and depressed and distressed over work.  A physical examination revealed full range of motion in her hips, pain with palpation over the lateral hip, but no pain on palpation of the sciatic notch.  Barron referred plaintiff to Tidewater physical therapy and recommended that she seek counseling.  (R. at 381.)  Barron excused plaintiff from work from January 9, 2003, through March 10, 2003.  (R. at 378.)

On April 11, 2003, plaintiff saw Barron, complaining of back pain and a knot in her right sacral area. (R. at 376.) Plaintiff also complained of anxiety, but she denied depression. A physical examination revealed that plaintiff's gait and station were normal. Barron referred plaintiff to Dr. Jones for the knot in her sacral area. (Id.)

On December 19, 2003, after surgery to remove the schwannoma, plaintiff saw Barron, reporting that the pain was gradually lessening but that she had increased anxiety since the surgery, fearing the pain would return. (R. at 375.) Barron noted that plaintiff was alert and oriented, her mood and affect were appropriate, and she was appropriately dressed. Barron prescribed Lexipro for depression and noted that she thought plaintiff had underlying anxiety which had been going on for a long time, as well as "a psychological addiction to narcotics." (Id.) At a follow-up visit on February 1, 2005, plaintiff reported some lessening of pain with physical therapy but stated that she did not go to physical therapy regularly. Plaintiff also reported pain reduction from trigger point injections. (R. at 365.) On January 31, 2006, plaintiff saw Barron, complaining of rectal pain and dissatisfaction with her pain management. Barron referred plaintiff to "Dr. O'Connell," a gynecologist. (R. at 481.)

Plaintiff received physical therapy treatments during separate time periods. (R. at 279-87, 396-427, 502-15.) In January, 2003, she was referred to Tidewater Physical Therapy, and after several visits, she discontinued the therapy. (R. at 418-27.) Between March and June, 2004, plaintiff received treatment from Dominion Physical Therapy. The records reveal that plaintiff's pain was decreasing, her mobility was increasing, her function was improving, and her strength had increased. (R. at 279-87.) Between July, 2004, and March, 2005, plaintiff was again receiving

treatment from Tidewater Physical Therapy.  (R. at 396-417.)  Plaintiff reported continued improvement in mobility and muscle strength and decreased muscle tightness.  (R. at 402-16.)  A physical therapy status report completed in February, 2005, indicated that plaintiff continued to improve in her lumbar and sacral segmental mobility. (R. at 403.)  Her hip strength and stability were gradually improving, although she had continued difficulty with stability and reported pain with prolonged sitting and standing.  Plaintiff again sought treatment from Tidewater Physical Therapy between May and August, 2006, for right hip, groin, and back pain. (R. at 502-15.) A status report dated August 23, 2006, noted that plaintiff's lower back pain resolved but that she still had pelvic pain on the right side and that she received only temporary relief from stretching.  (R. at 503.)

Plaintiff was treated by Lawrence J. Svihla, a chiropractor, between April and November, 2005. (R. at 428-31, 440-41.)  Svihla treated plaintiff three times per week for sacroiliac and low back pain, and by June, 2005, she was seventy percent improved.  (R. at 428-29.)  Svihla's opinion regarding ability to do work-related activities indicated that plaintiff could lift and carry less than ten pounds, could stand and sit less than two hours during an eight hour work day, and that she could not sit for more than ten minutes at a time.  (R. at 430.)  Plaintiff could occasionally crouch and climb stairs but never twist, stoop, or climb ladders.  (R. at 431.)  Additionally, her ability to reach, push, and pull were affected.  On November 4, 2005, Svihla reported that plaintiff was eighty percent improved.  (R. at 441.)

Between March and April, 2006, plaintiff was treated by Dr. Rebecca M. Ryder due to pain in her bladder, radiating to her back, and pain in her right buttock and pelvis, which felt like pulling from the

rectum up to the right side of her tailbone. (R. at 490, 499.)  Plaintiff reported incontinence with coughing and/or sneezing and when getting out of a car or carrying groceries.  A physical examination revealed Stage 1 cystocele and a Stage 1 rectocele.[3]  (R. at 491.)  After performing a laparoscopy, Ryder's diagnosis was right buttock and pelvic pain symptomatic rectocele stress, urinary incontinence, and pelvic adhesions. (R. at 487.)

b. <u>Disability Determination Services (DDS) Physicians</u>

On February 25, 2004, Dr. Daniel Walter reviewed plaintiff's psychiatric records and concluded that plaintiff had no medically determinable impairment as to her mental state.  (R. at 251.)  Walter noted that plaintiff had no psychological based treatment, but her pain management doctor had prescribed Elavil for anxiety.  (R. at 263.)  He found no diagnosis of depression or anxiety throughout plaintiff's file. Walter stated that plaintiff's activities of daily living were limited by pain and physical issues, but he found no support for plaintiff's claim of disability due to depression and anxiety.  (<u>Id.</u>)

On March 16, 2004, Michael Cole, D.O. completed a physical residual functional capacity assessment (PRFC), finding that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, could stand six hours in an eight-hour work day, could sit six hours in an eight-hour work day, and had unlimited ability to push and pull.  (R. at 265-72.)  Cole determined plaintiff had no postural or manipulative limitations.  (R. at 268.) Additionally, Cole found plaintiff's claims of interstitial cystitis, pain, inability to sit or stand for more than ten minutes, and femoral nerve damage to be only partially credible.  (R.

---

[3]  A rectocele is a hernial protrusion of part of the rectum into the vagina.  DORLAND'S, 1632 (30th ed. 2007).

at 271.)  Cole noted that there was no medical evidence of cystitis and that plaintiff had denied bladder symptoms during an examination in December, 2003.  Although plaintiff continued to complain of lower back and leg pain, examinations revealed a normal gait and full motor strength throughout.  Cole concluded by finding that there was no evidence that plaintiff was unable to walk, stand, or sit for more than ten minutes. Cole noted that he did not adopt Dr. Arora's findings of March 24, 2003, that restricted plaintiff to standing or walking no more than twenty-five percent of each hour, because her conclusion was made prior to plaintiff's surgeries, and the medical evidence did not continue to support that restriction.  (R. at 272.)

On August 26, 2004, Dana J. Sari, Ph.D., a clinical psychologist, completed a psychological evaluation, based on the record and an interview with plaintiff.  Sari found that plaintiff's psychiatric history was significant for depression as a teen, and she had recently been diagnosed with dysthymic disorder.  (R. at 302.)  Additionally, Sari noted a strong family history of depression.  Plaintiff reported her mood as depressed with daily crying spells, and Sari reported that plaintiff was tearful throughout the interview.  (R. at 302-03.)  Plaintiff was appropriately groomed and displayed pain behaviors during the interview. (R. at 303.)  Plaintiff was oriented to person, place, time, and situation; had intact recent and remote memory; and her attention and concentration were good, while her judgment and insight were fair.  Sari determined that plaintiff met the criteria for major depressive disorder and had significant decrease in her daily activities, tending to remain in bed all day.  Sari concluded that plaintiff was not capable of performing simple and repetitive tasks and was not able to deal with the usual stresses encountered in competitive work.  (R. at 304.)

15

On September 2, 2004, a mental residual functional capacity assessment (MRFC) was completed by Stonsa Inainna, Ph.D. (R. at 305-22.) After reviewing the record, Inainna concluded that plaintiff had the capacity and capability of performing simple, gainful activities. (R. at 308.) Inainna noted multiple inconsistencies in the record regarding plaintiff's depression. Before her psychological evaluation with Dr. Sari, plaintiff saw multiple doctors where she denied any psychiatric issues or depression and denied referrals for treatment. (R. at 308.) However, after receipt of her initial denial of disability, plaintiff sought counseling and was diagnosed with dysthmia. Despite Sari's report of plaintiff's tearfulness and despite her diagnosis of major depressive disorder, Sari noted that plaintiff had adequate eye contact, was alert, had intact recent and remote memory, and had good attention and concentration during the interview. Based on those factors, Inainna found that on all factors of understanding and memory, concentration and persistence, social interaction, and adaption, plaintiff was not significantly limited or only moderately limited in her abilities. (R. at 305-06.) As to her functional limitations, Inainna found only mild to moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (R. at 319.)

On September 10, 2004, Dr. Robert F. Castle completed a second PRFC assessment, finding that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk six hours in an eight-hour work day, sit six hours in an eight-hour work day, and had unlimited ability to push and pull. (R. at 324.) Castle found some postural limitations but no manipulative limitations, with the ability to stoop, kneel, crouch, or crawl only occasionally. (R. at 326.) Castle further

16

found plaintiff's claims to be only partially credible.  (R. at 329.)
Although plaintiff continued to complain of lower back and leg pain,
examinations revealed a normal gait and full motor strength throughout.
Castle noted that there was no evidence to show that plaintiff was unable
to walk, stand, or sit for more than ten minutes.  Although Dr. Arora had
previously opined that plaintiff could perform only "sedentary, sitting
type work," with very limited standing and walking, Castle discounted
Arora's opinion, noting that the opinion preceded plaintiff's surgical
intervention.  (R. at 330.)

### 2. **Plaintiff's Testimony before the ALJ**

Plaintiff testified that she is married and lives with her
husband.  (R. at 534.)  She stated that she has difficulty comprehending
what she reads and must reread several times.  (R. at 536.)  She also
stated that she has problems counting, making change because of stress
and anxiety, and had problems with her memory (R. at 536-38.)

Plaintiff testified that driving more than fifteen to twenty
minutes causes her right leg to pull and tighten up.  (R. at 538.)  She
stated that when she goes to the doctor the rest of her day is "shot"
because that is all the sitting she can handle, and she must spend the
rest of the day in bed.  She explained that sitting resulted in a pain
in her right hip which feels like a hot poker stabbing her, and the right
side is tight like a rubber band.  (R. at 539.)

Plaintiff stated that she had pain in her right hip and leg at
all times.  (R. at 540.)  She described the pain as a burn, a pull, and
a tightness that will not let her function.  She explained that walking
increased the burning and tightness, and when she sits, she has to lean

on her left hip.  (R. at 540, 542.)  She also stated that a hysterectomy done in 2000, caused paralysis in her left leg.  (R. at 549.)  She stated that her leg is still numb and weak and that a neurologist told her if "it hasn't come back yet, it never will." (R. at 549-50.)

Plaintiff testified that she had been diagnosed with interstitial cystitis.  (R. at 550.)  She stated that her bladder "waxes and wanes," and indicated that her system flares up, depending on what type of food she eats.  She also stated that her condition causes "incontinence" or frequent bathroom visits.  (R. at 550-51.)  She testified that even when she did not have a flare-up from the cystitis, she still experienced "bladder leakage," caused by lifting and reaching. (R. at 553.)

Plaintiff testified that she has depression but was not getting treatment because the medication made her sick.  (R. at 556.) She also indicated that she is not able to pursue counseling because it made her feel worse and because she could not talk about it. (R. at 557.) She testified that depression keeps her away from functioning and that she spends the whole day trying to get comfortable because the doctors will not give her pain medication.  She clarified that she was on a number of pain medications and commented that she did not know what was "wrong with the medical profession now." (R. at 558.)  She stated that "maybe this is too much for them to handle, so they, they just don't handle it."  She indicated that her doctors "refuse to recognize" her anxiety. (Id.)

Finally, plaintiff testified that her husband prepares the meals and does all the household chores.  (R. at 559-60.)  She stated

18

that she needs assistance washing her hair and, at times, getting out of the bathtub. (R. at 562.) She testified she has no hobbies, is not a member of any organizations or clubs, and does nothing socially. (R. at 560.)

When questioned about her work history, plaintiff responded by saying "I can't do this. I just can't talk about it." (R. at 340.) However, she did state that she had not worked since January, 2003. (R. at 340.)

### 3. The VE's Testimony

The VE testified that plaintiff's past relevant work as a retail sales person was light, semi-skilled work. He classified plaintiff's past relevant work as a clerk/typist and a data entry clerk as sedentary, semi-skilled work. The ALJ did not pose any hypothetical questions to the VE. (R. at 533-64.)

### C. The ALJ's Decision

On March 21, 2006, the ALJ issued his decision and concluded that plaintiff was not disabled as defined by the Social Security Act (SSA) at any time through the date of the decision. (R. at 18.) The ALJ found that plaintiff had not engaged in substantial gainful activity at any time relevant to the decision. He further found that plaintiff's impairments of interstitial cystitis and sacroilitis were severe and that the impairments did not meet or medically equal one of the listed impairments in Appendix 1. Finally, the ALJ found that plaintiff had the PRFC to perform light work and that she was capable of performing past relevant work. (R. at 19-20, 22.)

While the ALJ found adequate evidence to establish plaintiff's interstitial cystitis and sacroilitis, he did not find evidence of severe depression and anxiety that would result in work-related limitations. (R. at 19-20.)  The ALJ noted that plaintiff was able to think and act on her own, and she had only mild limitations in her daily activities and mild deficiencies in concentration. (R. at 20.)  Thus, the ALJ concluded that plaintiff's depression and anxiety were nonsevere impairments for the purposes of the decision.  (Id.)

The ALJ found that plaintiff could perform light work, involving occasionally lifting twenty pounds, frequently lifting or carrying up to ten pounds, sitting at least six hours in an eight-hour work day, and standing or walking six hours in an eight-hour work day. (R. at 20.) He also found that plaintiff could frequently climb stairs and ramps and occasionally stoop, kneel, crouch and crawl.  In coming to this determination, the ALJ considered all of plaintiff's symptoms and the extent to which her symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (R. at 21.)

The ALJ determined that plaintiff's severe impairments could produce all the symptoms plaintiff claimed, but he did not find entirely credible her statements regarding the intensity, duration, and limiting effects of the symptoms.  (R. at 21.)  The ALJ relied on Dr. Ross's records, which indicated that there was no basis for plaintiff's physical problems.  The ALJ found Dr. Svihla's report that plaintiff was limited to "less than sedentary exertion" was inconsistent with the overall record, including Svihla's own treatment records.  (Id.)

Finally, the ALJ gave significant weight to the opinion of the DDS physicians, finding the opinions consistent with the overall evidence. (R. at 22.) Because the ALJ found that plaintiff had an RFC to do light work, and because the VE's testimony classified plaintiff's prior work as light, semi-skilled work, the ALJ concluded that plaintiff's relevant past work was consistent with her RFC, thus she was not under a disability as defined by the SSA. (<u>Id.</u>)

### D. <u>Issues</u>

The issues in this matter are whether substantial evidence exists to support the Commissioner's final decision that plaintiff is not disabled within the meaning of the SSA and, in reaching that decision, whether the Commissioner employed the correct legal standards.

### II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Motion for Summary Judgment Standard

As set forth in Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party can show by affidavits, depositions, admissions, answers to interrogatories, the pleadings, or other evidence, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Rule 56 mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

The moving party is not entitled to summary judgment if there is a genuine issue of material fact in dispute. <u>Anderson v. Liberty</u>

21

Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of fact exists if "a reasonable jury could return a verdict for the nonmoving party."  Id.  In other words, summary judgment appropriately lies only if there can be but one reasonable conclusion as to the verdict.  See id.

> Finally, as the Fourth Circuit explained,
>
> [w]e must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion.  Summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the non-moving party has the burden to prove.

Tuck v. Henkel Corp., 973 F.2d 371, 374 (4th Cir. 1992)(citations omitted).

### B.  Standard of Review

When an individual makes a claim for DIB/SSI, he or she has the right to a hearing in order to determine whether he or she is disabled.  See 42 U.S.C. § 1383(c)(1)(A)(2000).  After a final decision has been rendered by the SSA, a party can seek review of the decision by filing a civil action in federal court.  See id. at § 1383(c)(3).  The factual findings which have been rendered by the Commissioner of Social Security "if supported by substantial evidence, shall be conclusive," and where a claim has been denied, the "court shall review only the question of conformity with such regulations and the validity of such regulations."  Id. at § 405(g).  The Commissioner's findings with respect to whether an individual is disabled should not be disturbed, even if the court may disagree with them, as long as the findings are supported by substantial evidence, and the correct law has been applied.  See Hays v.

Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). In determining what is substantial evidence, the Fourth Circuit has held that substantial evidence exists "[i]f there is evidence to justify a refusal to direct a verdict were the case before a jury. . ." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Specific regulations have been promulgated at the direction of Congress by the Secretary of Health and Human Services for the purpose of making an eligibility determination. See 20 C.F.R. § 416 (2000). The social security regulations (SSR) require the ALJ to conduct a five step sequential evaluation of a disability to determine whether a claimant is entitled to benefits. The five steps which the ALJ must follow are:

1.  Is the individual involved in substantial gainful activity?

2.  Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do work activities?

3.  Does the individual suffer from an impairment or impairments which meet or equal those listed in the C.F.R. at Appendix 1?

4.  Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5.  Does the individual's impairment or impairments prevent him or her from doing any other work?

See id. at § 404.1520/416.920.  In reviewing a social security case, the ALJ bears the ultimate responsibility for weighing the evidence.  See Hays, 907 F.2d at 1456.

## B.  Discussion

A person is eligible for DIB if he or she is insured for such benefits, has not attained retirement age, has filed an application for such benefits, and is under a disability.  See 42 U.S.C. § 423(a)(2000). The code and SSR carefully detail the requirements which a person must meet to be fully insured and eligible for such insurance benefit payments.  See id. at § 423(c).

The SSI program is designed "to assure a minimum level of income for people who are age sixty-five or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level." 20 C.F.R. § 416.110.  Congress has stated that benefits will be paid to an individual if that person is aged, blind or disabled and has limited income or resources which total less than the dollar figure set out in 42 U.S.C. § 1382(a).

While the requirements for these two types of social security benefits differ, the definitions and terms used to determine if a person is disabled and, therefore, eligible for such benefits are the same.  A person is considered disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months." Id. at § 423(d)(1)(A).  To be disabled, an individual's impairments must be:

> of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. at § 423(d)(2)(A).

### a.  **Plaintiff has not been engaged in substantial gainful activity**.

The first step in evaluating whether a disability exists requires a determination of whether plaintiff has engaged in substantial gainful activity since the onset of the alleged disability.  See 20 C.F.R. §§ 404.1520; 415.920 (2000).  If a claimant is working, and the work which he or she is doing is considered to be substantial gainful activity, then the claimant will be found not disabled.  See id. at §§ 404.1520(b); 416.920(b).  Substantial gainful activity is defined as "work activity that involves doing significant physical or mental activities . . . even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  Id. at §§ 404.1572(a); 416.972(a); see also id. at §§ 404.1510; 416.910.  In order to be gainful activity, the work activity must be done for pay or for some type of profit, even if that profit is not realized.  See id. at §§ 404.1510(b); 404.1572(b); 416.910(b); 416.972)b).  Substantial gainful activity does not include daily or recreational activities, including "taking care of yourself, household tasks, hobbies,

therapy, school attendance, club activities, or social programs. . . ." Id. at §§ 404.1572(c); 416.972(c).

The ALJ found that plaintiff had not engaged in substantial gainful activity at any time after her alleged date of disability onset in January, 2003.   The ALJ's decision at step one is supported by substantial evidence, therefore, the Court will proceed to step two.

### b.  **Plaintiff suffers from a severe impairment**.

The second step of the disability evaluation requires the Court to determine whether plaintiff suffers from a severe impairment. See 20 C.F.R. §§ 404.1520(c); 416.920(c)(2000).  If a claimant does not suffer from a severe impairment, then he or she cannot be considered disabled, and thus, he or she is ineligible for DIB.   See id.  To find that a severe impairment exists, a claimant must have "any impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities. . . ."  Id.  The impairment must be the product of "anatomical, physiological, or psychological abnormalities," and it must be established by "medical evidence consisting of signs, symptoms, and laboratory findings. . . ."  Id. at §§ 404.1508; 416.908.

Examples of basic work activities which must be significantly limited by the impairment include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers, and usual work situations; and

(6) Dealing with changes in a routine work setting.

Id. at §§ 404.1521(b); 416.921(b).  The combined effect of all of the impairments which an individual suffers shall be considered together, without regard for whether any one of those symptoms would individually be enough to qualify as a severe impairment.  See id. at §§ 404.1523; 416.923.  The Supreme Court has held that this step of the disability evaluation is a de minimis threshold.  See Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987).  The purpose of requiring such a threshold showing of medical severity is to increase "the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account."  Id. at 153.  Accordingly, the severity determination must have "a strictly medical basis . . . without regard to vocational factors."  Id. at 151 (quoting the Senate Report accompanying the 1984 amendments.)

The ALJ found that plaintiff has interstitial cystitis and sacroilitis, which are severe within the meaning of the SSR.  Statements of treating physicians, as well as plaintiff's testimony, indicate that plaintiff has continued to suffer from sacroilitis and interstitial cystitis with flair ups.  The DDS physicians, Dr. Cole and Dr. Castle, did not find medical evidence of interstitial cystitis, noting doctor visits where plaintiff had denied bladder symptoms.  (R. at 271, 323.)  However, Dr. McAdam noted in 2001, that plaintiff had a well-documented

history of chronic interstitial cystitis, and plaintiff testified to the condition at her hearing.  (R. at 247, 550.)

The ALJ found that plaintiff's alleged severe depression and anxiety do not amount to a mental disorder that results in work-related limitations.  (R. at 20.)   Specifically, the ALJ found that plaintiff is able to think, act in her own interests, communicate, handle her own affairs, and adjust to ordinary emotional stresses without difficulty. He found only mild limitations in plaintiff's daily activities and mild deficiencies in her concentration or persistence, and the record supports this finding.

The record reveals that plaintiff denied depression during her visit with Dr. Arora on February 12, 2003.  In January, 2003, Dr. Barron noted that plaintiff had reported being anxious and depressed, but in April, 2003, she complained only of anxiety, and she denied depression. Plaintiff continued to deny any psychological problems during her initial consultation with Dr. Gajjar in September, 2003.  On October 3, 2003, Dr. McAdam noted that plaintiff had normal mental status, good orientation and memory, and normal concentration.  On February 10, 2004, Dr. Ross noted that plaintiff claimed that she had anxiety and depression but had not sought psychological or psychiatric help.  A February 25, 2004, Dr. Walter, a DDS physician, found no impairments as to plaintiff's mental state.  After the initial denial of disability on March 19, 2004, plaintiff went to the Hampton Roads Counseling Center and was diagnosed with dysthymic disorder, but the evaluation of July 26, 2004, noted that while plaintiff had a flat, guarded affect, she had appropriate thought content and organization, as well as appropriate attention span and concentration and no confusion.  Dr. Sari's psychological evaluation of August 26, 2004, diagnosed plaintiff with major depressive disorder, yet,

28

Sari noted that plaintiff was oriented to person, place, time, and situation; she had intact recent and remote memory; and she had good attention and concentration, while her judgment and insight were fair. Finally, Dr. Inainna found in his MRFC assessment that plaintiff was not significantly limited or only moderately limited in her abilities in understanding, memory, concentration, persistence, social interaction, and adaption.  Therefore, substantial evidence exists to support the ALJ's finding that plaintiff's interstitial cystitis and sacroilitis are severe, but her alleged depression and anxiety are not severe. Therefore, the Court will proceed to step three of the analysis.

**c.  <u>Plaintiff does not suffer from an impairment or combination of impairments that meets or equals one found in the listings</u>.**

The third step of the evaluation requires a determination of whether plaintiff suffers from an impairment or impairments which meet(s) or equal(s) one found in the listings set forth in Appendix 1.  <u>See id.</u> at §§ 404.1520(d); 416.920(b)(2000).  The listings provide a description "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." <u>Id.</u> at §§ 404.1525(a); 416.925(a).  The impairment must have a duration of at least twelve months, unless such impairment is expected to cause claimant's death.  <u>See id.</u>; <u>see also id.</u> at §§ 404.1509; 416.909. Without more, a diagnosis that a claimant has an impairment listed in the Appendix does not automatically result in a finding of a disability.  <u>See id.</u> at §§ 404.1525(d); 416.925(d).  Claimant has the burden to show through medical evidence, such as symptoms, signs, doctors opinions, and laboratory findings, that his or her condition meets the precise criteria set out in the listings for that particular impairment.  <u>See id.</u>

29

If a claimant's impairment or impairments can be found in the listings, or are equal to impairments that are set forth in the listings, a claimant will be considered disabled without considering his or her age, education, or work experience.  See id. at §§ 404.1520(d); 416.920(d).  A claimant's impairments are medically equivalent to a listed impairment found in Appendix 1 "if the medical findings are at least equal in severity and duration to the listed findings." Id. at §§ 404.1526(a); 416.926(a).  In order to make a determination as to medical equivalency, the SSR state:

> We will compare the symptoms, signs, and laboratory findings about your impairment(s), as shown in the medical evidence we have about your claim, with the medical criteria shown with the listed impairment.  If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal.  If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment.

Id.  Therefore, just because an impairment is not listed within the Appendix, it does not necessarily follow that the claimant's impairment will not be considered a disability.  If the listing is met, then a claimant is considered disabled and is entitled to DIB and/or SSI.  If a listing within Appendix 1 is not met, then a claimant has the burden to show that he or she is unable to perform past relevant work.

The ALJ found that plaintiff's impairments were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, subpart P, section 1.04.  The parties do not dispute this finding, therefore, the Court will proceed to step four of the analysis.

### d. **Plaintiff is unable to perform past relevant work**.

If the impairment experienced by plaintiff does not meet or exceed those set forth in Appendix 1, it is necessary to proceed to steps four and five. Step four of the analysis requires the Court to compare what plaintiff can still do, despite his or her impairments. *See* 20 C.F.R. §§ 404.1520(e); 416.920(e)(2000). The burden still remains with plaintiff to prove that he or she is unable to perform past relevant work. *See* Thorne v. Wienberger, 530 F.2d 580, 582 (4th Cir. 1976). If plaintiff is found to be capable of performing past relevant work, then he or she will not be considered to be disabled, and the claim will be denied. However, if plaintiff is unable to return to past relevant work, the analysis proceeds to step five, and the burden shifts to the Commissioner. *See* 20 C.F.R. §§ 404.1566, 416.966 (2000).

In determining whether a claimant is able to perform past relevant work, the Court is directed to look at a medical assessment of the individual's RFC. *See id.* at §§ 404.1545, 416.945. The RFC provides the Court with a report of what the individual can still do despite his or her impairments or combination of impairments as well as a vocational assessment of past job requirements. If a claimant's RFC exceeds requirements of his or her past relevant work, then he or she is determined to be able to return to his or her past relevant work, and the claim can be denied. *See id.* at §§ 404.1560(b); 404.1561; 416.960(b); 416.961. However, if a claimant's RFC has been reduced below the requirements of his or her past relevant work, then the test at step four is met, and the evaluation proceeds to step five. *See id.* at §§ 404.1560(c), 416.960(c).

The VE classified plaintiff's past relevant work as a sales clerk as light, semi-skilled work, and her work as a clerk/typist as sedentary, semi-skilled.  The ALJ found that plaintiff has the  RFC to perform light work. (R. at 20.)  He determined that plaintiff retained the RFC to lift no more than twenty pounds at a time, with frequent lifting or carrying of objects up to ten pounds.  He found that the evidence supported a finding that plaintiff can sit at least six hours in an eight-hour work day and stand or walk six hours in an eight-hour work day.

The ALJ found that plaintiff's severe impairments could reasonably be expected to produce her alleged symptoms.  Among the symptoms noted are hip and back pain, an inability to sit or stand for long periods of time, and bladder leakage.  The ALJ noted plaintiff does no household chores, does no laundry, does not prepare dinner, has no hobbies, and does not participate in social activities.  However, based on the record, the ALJ determined that plaintiff's claims about the intensity, duration, and limiting effects of the symptoms are not entirely credible.  (R. at 21.)

The SSA states that each finding of fact must be supported by substantial evidence.  42 U.S.C. § 405(g).  The ALJ's decision that plaintiff is able to perform light or sedentary, semi-skilled work is based on the findings that plaintiff was not entirely credible regarding the degree of pain she experiences and the extent to which the pain limits her activities. (R. at 21.) Although the Court may not substitute its own judgment on the issue of credibility, it is "empowered" to review the ALJ's credibility determination for substantial evidence.  Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005).

The factors relevant to credibility are: (1) daily activities; (2) location, duration, frequency, and intensity of pain; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of medication; (5) treatment received for pain relief; (6) nontreatment measures used to alleviate pain; and (7) any other factors concerning functional limitations due to pain. 20 C.F.R. § 404.1529(c)(3). Also included in the consideration are plaintiff's statements regarding symptoms and their limiting effects and the opinions of examining and nonexamining physicians. 20 C.F.R. § 404.1529(c)(1).

The ALJ considered one treating physician and the reports of the DDS physicians in determining plaintiff's credibility. The SSA requires that the ALJ state specific reasons for the weight given to a treating source's medical opinion, supported by the evidence in the record, which must be "sufficiently specific to make clear to any subsequent reviewer the weight the adjudicator gave to the treating source's medical opinion, and the reasons for that weight." 20 C.F.R. § 404.1527(d)(2). The Fourth Circuit demands that the ALJ "explicitly indicate[] the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984).

The ALJ considered the report of Dr. Ross, a treating physician, as substantial evidence in his determination of plaintiff's credibility. The reports indicated no medical basis for specifically limiting plaintiff's functional activities and no explanation for plaintiff's persistent symptoms. Ross's records reveal that plaintiff had good strength in muscle groups, pulling her hip back into extension did not cause significant discomfort, there were no radicular symptoms with straight leg raises, her lumbar spine had normal alignment, and her

gait and pattern were normal.  The ALJ cites Ross's findings, as well as the reports of the DDS physicians.  The opinions of both DDS physicians indicate that plaintiff is able to sit six hours in an eight-hour work day, stand six hours in an eight-hour work day, occasionally lift twenty pounds and frequently lift ten pounds.  The ALJ gave the reports of the DDS physicians substantial weight, finding them consistent with the overall evidence in the record.  The more consistent a medical opinion is with the record as a whole, the more weight it will be given.  20 C.F.R. § 1527(d)(4).

While the ALJ claims the opinions of the DDS physicians are consistent with the overall evidence in the record, he cited the opinion of only one treating physician in hundreds of pages of medical records from over fifteen different doctors.  The ALJ did not address any of the record that does not support his conclusion beyond Dr. Svihla's reports, which the ALJ found did not support Svihla's own conclusions.  Other than Dr. Ross, the ALJ did not indicate reliance on the records of any other physician to support his conclusion that plaintiff is not disabled.

The fact that the record is voluminous (564 pages) and that there are multiple notations of plaintiff's complaints and allegations of symptoms does not automatically mean that plaintiff should be found disabled.  20 C.F.R. §§ 404.1508, 1528(a).  There may be substantial evidence in the record to support the ALJ's conclusion, but the ALJ failed to provide sufficient proof of that evidence.

Deferring to only one treating physician's opinion and the opinions of the nontreating physicians does not clearly indicate that the ALJ's finding is consistent with the overall record or that the ALJ's finding is supported by substantial evidence.  In order for the ALJ's decision to stand, he must clearly indicate the weight given to treating

sources, and his decision must be supported by substantial evidence.  42 U.S.C. § 405(g); 20 C.F.R. § 404.1527(d)(2).

### III. RECOMMENDATION

The ALJ failed to establish by substantial evidence that plaintiff can her perform past relevant work.  The ALJ did not establish by sufficient evidence that plaintiff can perform light work in citing the opinion of Dr. Ross, plaintiff's treating physician, and the report of the DDS physician.  Therefore, the Court recommends that action on defendant's motion for summary judgment be DEFERRED and that action on plaintiff's motion for summary judgment be DEFERRED.  The Court further recommends that the case be REMANDED to the ALJ for further explanation of how he arrived at the conclusion that plaintiff can perform relevant past work, identifying all of the experts and the facts, which support his conclusion

### IV. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten days from the date of mailing of this report to the objecting party computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three days permitted by Rule 6(e) of said rules.  See 28 U.S.C. § 636(b)(1)(C)(2000); FED.R.CIV.P. 72(b).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  <u>Thomas v. Arn</u>, 474 U.S. 140

(1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

_____/s/_____

**James E. Bradberry**
**United States Magistrate Judge**

**Norfolk, Virginia**
<u>**December 11, 2008**</u>